1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                          **CENTRAL DISTRICT OF CALIFORNIA**

9

10   SHELBY ELLIS,                        )      NO. CV 04-08043 (Mc)
                                          )
11                Plaintiff,              )
                                          )      MEMORANDUM OF DECISION
12         v.                             )      AND ORDER IN A SOCIAL
                                          )      SECURITY CASE
13   JO ANNE B. BARNHART,                 )
     Commissioner of the                  )
14   Social Security Administration,      )
                                          )
15                Defendant.              )
     _____)

16

17        The plaintiff, SHELBY ELLIS, filed the present action for review

18   of a final determination of the Commissioner of Social Security (the

19   "Commissioner") that the plaintiff is not disabled and not entitled to

20   Supplemental Security Income ("SSI") disability benefits.  For the

21   reasons set forth below, the court finds that the decision of the

22   Commissioner is supported by substantial evidence and that there are

23   no errors of law.   The decision of the Commissioner, therefore, is

24   affirmed.

25                              **BACKGROUND**

26        The plaintiff protectively filed an application for SSI

27   disability benefits under the Social Security Act (the "Act") on

28   \\\

1   April 30, 1996.[1] [Administrative Record ("AR") 147, 148-49.]   The

2   Commissioner denied the application initially and on reconsideration.

3   [AR 82-85, 89-92.]   At the plaintiff's request, an administrative

4   hearing was held before Administrative Law Judge David Agatstein

5   (the "ALJ") on June 17, 2004. [AR 56-79.]   On June 24, 2004, the ALJ

6   filed a decision concluding that the plaintiff was not under a

7   disability as defined in the Act at any time through the date of the

8   decision. [AR 15-32.]   The Appeals Council denied the plaintiff's

9   request for review of the ALJ's decision. [AR 7-9.]   The decision of

10  the ALJ stands as the final decision of the Commissioner.

11       Thereafter, the plaintiff filed the present action.   The

12  plaintiff and the Commissioner have consented to proceed before a

13  United States Magistrate Judge.   The parties have entered into a Joint

14  Stipulation setting forth their arguments.

15                          **STANDARDS OF REVIEW**

16       The court must sustain the findings of the Commissioner unless:

17  (a) they are not supported by substantial evidence in the record as a

18  whole; or (b) the Commissioner applied an improper legal standard.

19  See 42 U.S.C. 405(g); Gordon v. Secretary of Health and Human

20  Services, 803 F.2d 1071, 1072 (9th Cir. 1986).   Substantial evidence

21  means "more than a mere scintilla" but less than a preponderance.

22  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

23  L.Ed.2d 842 (1971); Desrosiers v. Secretary of Health and Human

24  Services, 846 F.2d 573, 576 (9th Cir. 1988).   "Substantial evidence"

25  is evidence a "reasonable mind might accept as adequate to support a

26  \\\

27  _____

28       [1]The denials of the plaintiff's prior applications are not at
    issue. [See AR 16.]

1   conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 402; <u>Gordon v.</u>

2   <u>Secretary of Health and Human Services</u>, 803 F.2d at 1072.

3       This court must review the record as a whole and consider adverse

4   as well as supporting evidence.  <u>See</u> <u>Green v. Heckler</u>, 803 F.2d 528,

5   529-30 (9th Cir. 1986).  Where evidence is susceptible of more than

6   one rational interpretation, the court must sustain the Commissioner's

7   decision.  <u>See</u> <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir.

8   1984).

9                 **THE FIVE-STEP SEQUENTIAL EVALUATION**

10      The Commissioner has established a five-step sequential

11  evaluation for determining whether a person is disabled.  First, the

12  Commissioner determines whether the person is engaged in "substantial

13  gainful activity."  If so, the Commissioner denies disability

14  benefits.  Second, if the person is not so engaged, the Commissioner

15  determines whether the person has a medically severe impairment or

16  combination of impairments.  If the person does not have a severe

17  impairment or combination of impairments, the Commissioner denies

18  benefits.  Third, if the person has a severe impairment, the

19  Commissioner determines whether the impairment meets or equals one of

20  a number of "listed impairments."  If the impairment meets or equals a

21  "listed impairment," the Commissioner conclusively presumes that the

22  person is disabled.  Fourth, if the impairment does not meet or equal

23  the "listed impairments," the Commissioner determines whether the

24  impairment prevents the person from performing past relevant work.  If

25  the person can perform past relevant work, the Commissioner denies

26  benefits.  Fifth, if the person cannot perform past relevant work, the

27  burden shifts to the Commissioner to show that the person is able to

28  perform other kinds of work.  The person is entitled to disability

1   benefits only if he or she is unable to perform other work.  See 20

2   C.F.R. § 404.1520 and 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S.

3   137, 140-42, 107 S.Ct. 2287, 96 L.Ed 119 (1987).

4                           **FINDINGS OF THE ALJ**

5        The plaintiff was born September 12, 1945. [AR 148.]  The ALJ

6   found that the plaintiff has a high school education and no past

7   relevant work. [AR 31.]  The plaintiff alleges that he has been unable

8   to work since February, 1963, because of physical and mental problems.

9   More specifically, the plaintiff alleged back, hip, and neck pain, a

10  history of stabbings and a gunshot wound to the left leg.  The

11  plaintiff also alleges mental problems which caused him to lose his

12  memory.  [AR 152.]

13       The ALJ found that the plaintiff had not engaged in substantial

14  gainful activity since the alleged onset of disability.  The ALJ found

15  that the plaintiff had medically determinable impairments consisting

16  of osteoarthritis of the lumbosacral spine, early cataracts in both

17  eyes, history of treatment in 1999 for a scalp lymphoma, type B, with

18  radiation therapy, history of hospitalization in 1999 for left-sided

19  numbness with a finding of lacunar infarct on a diagnostic scan,

20  dysthymia, and possible borderline intellectual functioning.  The ALJ

21  found that these impairments in combination were severe but that the

22  plaintiff did not have an impairment or combination of impairments

23  listed in, or medically equal to one listed in, Appendix 1, Subpart P,

24  Regulations No. 4. [AR 30-31.] The ALJ found that the plaintiff's

25  allegations regarding his limitations were not totally credible and

26  that the plaintiff retained the residual functional capacity to

27  perform work at the medium level of exertion.  More specifically, the

28  ALJ found that the plaintiff could lift and/or carry 50 pounds

occasionally and 25 pounds frequently, stand and/or walk for six
hours, and sit for six hours in an eight-hour workday.  The plaintiff
was also limited to the performance of unskilled work, involving
simple, repetitive tasks.  The plaintiff must have a minimum of
contact with supervisors, co-workers, and the general public.  The ALJ
found that the plaintiff has no past relevant work.  The ALJ found
that the plaintiff was of "advanced age" as of his fifty-fifth
birthday, September 12, 2000, but that prior to that date, he was an
individual "closely approaching advanced age."[2]  The ALJ further found
that the plaintiff had a high school education.  The ALJ determined
that although the plaintiff's non-exertional limitations did not allow
him to perform the full range of medium work, the plaintiff
nevertheless retained the residual functional capacity to perform a
significant range of medium work.  Using Medical-Vocational Rules
203.21 and 203.14 as a framework for decision-making, the ALJ found
that there were a significant number of jobs in the national economy
that the plaintiff could perform.  Accordingly, the ALJ concluded that
the plaintiff was not under a "disability" as defined in the Act at
any time through the date of his decision.  [AR 31.]

### THE PLAINTIFF'S CONTENTIONS

The plaintiff contends that the ALJ's reliance upon the
vocational expert's testimony was improper because he failed to
propound a complete hypothetical to the vocational expert.  The
plaintiff also argues that the ALJ erred in finding that the plaintiff
possessed a high school education.

---

[2]An individual age fifty-five or older is considered a person of
"advanced age."  20 C.F.R. § 416.963(e).  An individual between age
fifty and fifty-four is considered a person "closely approaching
advanced age."  20 C.F.R. § 416.963(d).

1

**DISCUSSION**

2

**The hypothetical question to the vocational expert**

3      "In order for the testimony of a VE to be considered reliable,

4   the hypothetical posed must include 'all of the claimant's functional

5   limitations, both physical and mental' supported by the record."

6   Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002), quoting Flores

7   v. Shalala, 49 F.3d 562, 71 (9th Cir. 1995).

8      The plaintiff contends that the hypothetical to the vocational

9   expert was flawed "because the vocational expert was not asked to

10  consider Ms. [sic] Ellis's nonexertional limitations of borderline

11  intellect.  Simply put, the vocational expert was not asked if someone

12  operating in the bottom 8 percent of the population could perform work

13  activity which requires an individual to be above the bottom 10

14  percent." [Joint Stipulation at 9.]

15     The plaintiff's argument is essentially as follows:

16  1.  "With caution, the Administrative Law Judge gave the

17      greatest weight to the mental diagnosis given by the

18      medical expert Dr. [Glenn] Griffin."

19  2.  Dr. Griffin opined that the plaintiff suffered from

20      dysthymia and borderline intellectual functioning.

21  3.  The ALJ found that the plaintiff could perform the work

22      of hospital cleaner, DOT 323.687-010; laborer, stores,

23      DOT 922.687-058; and hand packager, DOT 920.587-018.

24  4.  The plaintiff's borderline intellectual functioning

25      means that the plaintiff is functioning at the lowest

26      eighth percentile of the population. [Joint Stipulation

27      at 4-5.]  As support for this statistic, the plaintiff

28      relies upon a page from the Wechsler Adult Intelligence

1          Scale-Revised attached to the Joint Stipulation as
2          Exhibit 2.  This page indicates that a person with
3          borderline intellectual functioning falls within the
4          lowest ten per cent of the population. [Joint
5          Stipulation, Exhibit 2.]
6    5.    The DOT identifies the jobs enumerated by the ALJ as
7          requiring a General Learning Ability of 4.
8    6.    A General Learning Ability of 4 is defined as the
9          lowest one-third, excluding the bottom ten per cent.
10   7.    Since the plaintiff has borderline intellectual
11         functioning, he is functioning at the lowest eighth
12         percentile of the population, which is within the
13         lowest ten percent specifically excluded from the
14         General Learning Ability requirements of the jobs of
15         hospital cleaner, laborer/stores, and hand packager.
16         The plaintiff, therefore, cannot perform these jobs.
17         [Joint Stipulation at 6.]
18         The plaintiff's argument is not persuasive.  Although the ALJ
19   indicated that he gave the greatest weight to the mental diagnoses
20   offered by Dr. Griffin, the ALJ did not adopt the entirety of Dr.
21   Griffin's opinions.  More particularly, unlike Dr. Griffin, and
22   contrary to what the plaintiff implies, the ALJ did not find that the
23   plaintiff suffered from borderline intellectual functioning but rather
24   "possible borderline intellectual functioning" (emphasis added). [AR
25   31.] In so finding, the ALJ essentially rejected the diagnoses of
26   every treating and examining physician, none of whom indicated that
27   the plaintiff suffered even from "possible borderline intellectual
28   functioning." [AR 252 (diagnosed chronic paranoid schizophrenia, but

"[i]ntellectually, he appeared normal"); AR 522 (diagnosed, <u>inter alia</u>
with various learning disorders, but IQ estimated to be in the low
average range; AR 546 (diagnosed with a history of learning disorders
with functioning in the borderline to low average range); AR 556
(diagnosed on Axis II with learning disorder, by history, but assessed
to be functioning in the low average range of intellectual functioning
despite "generally valid" estimate of functional levels as reflected
in IQ testing results which revealed a verbal IQ of 89, performance
I.Q. of 74, and a full scale I.Q. of 80); AR 570 (no diagnosis of
borderline intellectual functioning with intellectual functioning
found to be "grossly intact"); AR 621, 623-24, 628 (no diagnosis of
borderline intellectual functioning by the plaintiff's treating
physicians or even reports of symptoms reflecting impairment of
intellectual functioning).]

The IQ test results, on the other hand, may be considered to fall
within the American Psychiatric Association's definition of
"borderline intellectual functioning" (I.Q. 71-84).  American
Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental</u>
<u>Disorders</u> <u>IV-TR</u>, 740 (4th ed. 2000).  However, the ALJ specifically
questioned the validity of the IQ scores and the diagnoses regarding
the plaintiff's intellectual functioning "given [the plaintiff's]
ability to study for and pass the GED examination while in prison and
his history of exaggerating his symptoms." [AR 20.] The plaintiff
raises no issue concerning these findings, and most notably, nowhere
in his argument does the plaintiff actually claim that the ALJ found
that the plaintiff suffered from borderline intellectual functioning
but rather that the ALJ gave greatest weight to the testimony of Dr.
Griffin, and Dr. Griffin found that the plaintiff suffered from

1   borderline intellectual functioning.  Clearly, the plaintiff has

2   ignored a crucial element in his argument—namely, that it is the ALJ's

3   finding that ultimately matters, not Dr. Griffin's.  Sample v.

4   Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)("The ALJ need not

5   substitute the judgment of expert witnesses for his own"); Russell v.

6   Bowen, 856 F.2d 81, 83 (9th Cir. 1988)("It is not necessary to agree

7   with everything an expert witness says in order to hold that his

8   testimony contains 'substantial evidence'").

9       Rather, the plaintiff proceeds as if the ALJ found that the

10  plaintiff did, in fact, suffer from borderline intellectual

11  functioning.  Therefore, according to the plaintiff, his functioning

12  is below the lowest tenth percentile of the population, which is

13  specifically excluded from the jobs enumerated by the vocational

14  expert.  However, because it is clear from the record that the ALJ did

15  not find that the plaintiff actually suffered from borderline

16  intellectual functioning or that the ALJ accepted the validity of the

17  IQ test results, the inference that the ALJ implicitly found that the

18  plaintiff's intellectual functioning fell within the lowest percentile

19  of the population is not established.  Because the premise of the

20  plaintiff's argument is flawed, the plaintiff's ultimate conclusion

21  likewise is flawed.[3]

22

23      [3]The plaintiff's reliance upon a single page from the Wechsler
    Adult Intelligence Scale-Revised (WAIS-R) is otherwise problematic.
24  The plaintiff essentially proffers this single page as support for his
    argument that a person with borderline intellectual functioning falls
25  within the lowest tenth percentile.  This page suggests that a person
    with borderline intellectual functioning does, in fact, fall within
26  the lowest tenth percentile. "Borderline intellectual functioning" is
    defined as corresponding to an IQ between 70-79. [Joint Stipulation,
27  Exhibit 2.]  On the other hand, the American Psychiatric Association's
    definition of borderline intellectual functioning covers a range of IQ
28  from 71-84.  American Psychiatric Association, Diagnostic and

                                - 9 -

1    _____In summary, the ALJ did not find that the plaintiff suffered from

2    borderline intellectual functioning, and the plaintiff himself does

3    not claim that the ALJ so found.  This being the case, there is no

4    evidence that the ALJ implicitly found that the plaintiff was

5    functioning in the lowest tenth percentile of the population, and

6    therefore, the ALJ was not required to include such a finding in his

7    hypothetical question to the vocational expert. Rollins v. Massanari,

8    261 F.3d 853, 857 (9th Cir. 2001)(There was no error where the ALJ

9    included all the limitations that he found to exist if his findings

10   are supported by substantial evidence).

11      Moreover, granting that even "possible borderline intellectual

12   functioning" could be a non-exertional limitation which must be posed

13   to the vocational expert, the mere fact that the ALJ did not include

14   these words in his hypothetical does not mean that the ALJ's

15   hypothetical was incomplete.  There is nothing magical about these

16   words, which, by themselves, fail to convey any idea of the nature and

17   degree of impairment in work function.  The issue, therefore, is not

18   just that the plaintiff suffers from "possible borderline intellectual

19   functioning" but rather the effect of this impairment on his

20

21   Statistical Manual of Mental Disorders IV-TR, 740 (4th ed. 2000).
     According to the WAIS scale found in Exhibit 2, the latter range would
22   also fall within the low average classification (IQ 80-89).  Thus,
     there is a question of mixing terminology.  The WAIS classification
23   apparently differs from that of the Diagnostic and Statistical Manual.
     There is also a question of which IQ result is to be used in
24   determining the proper IQ range-the verbal, the performance, or the
     full scale. In the plaintiff's case, there is a fifteen point range
25   between performance and verbal I.Q.  This court could speculate that
     the classification refers to the full scale IQ but there is no actual
26   evidentiary foundation to support that assumption.  Last, the
     plaintiff's argument depends almost entirely on one page out of
27   presumably hundreds of pages of text to evaluate a record described by
     Dr. Griffin as "very complicated." [AR 170.]
28

1    functioning [Holz v. Apfel, 191 F.3d 945, 947-48 (8th Cir. 1999)(The
2    matter was remanded for consideration of the effect of Holz's
3    borderline intellectual functioning] and whether the hypothetical
4    question specifically incorporated the plaintiff's limitations [Howard
5    v. Massanari, 255 F.3d 577, 583 (8th Cir. 2001)("By including in the
6    RFC the qualification that Howard is only capable of performing
7    simple, routine, repetitive tasks, the ALJ properly accounted for her
8    borderline intellectual functioning, a nonexertional impairment");
9    Burns v. Barnhart, 312 F.3d 113, 123 (3rd Cir. 2002)(While the term
10   "simple, repetitive one, two-step tasks" "could encompass a lack of
11   intelligence," it did not "necessarily incorporate all of the
12   borderline aspects of Burns' intellectual functioning or the other
13   deficiencies identified in [the consultative psychologist's]
14   report")].

15        However, other than arguing that the vocational expert should
16   have been questioned whether an individual in the 8th percentile can
17   perform the jobs enumerated, the plaintiff fails to indicate any other
18   restrictions which were improperly excluded from the hypothetical
19   questions to the vocational expert.

20        In the plaintiff's case, there are multiple conflicting opinions
21   concerning the plaintiff's abilities.  One consultative examiner, Dr.
22   Gustavo Vintas, diagnosed chronic paranoid schizophrenia in June,
23   1996, and recommended ongoing psychiatric treatment.  Based upon his
24   examination of the plaintiff and upon the plaintiff's history, Dr.
25   Vintas assessed that the plaintiff could not follow job instructions.
26   [AR 252.] However, the ALJ rejected this assessment, and there is no
27   issue raised as to the correctness of this rejection.  [AR 25.] This
28   court further notes that shortly after the plaintiff was examined by

- 11 -

Dr. Vintas, the plaintiff was incarcerated, and, as noted by the ALJ, there is little indication of any mental problems in the plaintiff's prison medical records. [AR 27.]

Sharply contrasting with Dr. Vintas' opinion is the assessment four years later of Wayne R. General, Ph.D.  Although Dr. General felt that the plaintiff was only marginally capable of managing benefits in his best interest, and although he concluded that the plaintiff's prognosis for returning to work was fair at best due to his history of incarceration [AR 522-23], otherwise, Dr. General assessed the plaintiff's impairments in various functions to be mild except that the plaintiff's impairment in ability to respond to customary work pressures and perform complex and varied tasks were moderately impaired. [AR 524-25.]

In August, 2003, the plaintiff was again evaluated by Melanie K. Moran, Ph.D., who performed some psychological testing.  Dr. Moran diagnosed a history of learning disorders and psychotic symptoms by report but not in evidence during the examination.  On Axis II, Dr. Moran diagnosed that the plaintiff was functioning in the borderline to low average range of intelligence but found that the plaintiff did "not evidence specific cognitive or emotional limitations that would prevent him learning and implementing at least simple repetitive skills," although because of the plaintiff's long incarceration, the plaintiff might have some difficulty adapting to changes in a work environment.  Additionally, the plaintiff "would function best in a non-interactive setting.  Reasoning capacities are intact. The patient related well to this authority figure.  He [did] not require structure to stay on task.  He would be able to maintain a regular schedule." [AR 546.]

1   One month later, in September, 2003, the plaintiff underwent yet
2   another psychological examination with Rosa Colonna, Ph.D., which
3   included IQ testing.  Dr. Colonna opined that "[g]ive [sic] the test
4   results and clinical data, the claimant is currently estimated to be
5   functioning in the low average range of intellectual ability."  Dr.
6   Colonna's "[p]robable DSM-IV diagnoses" included mood disorder under
7   Axis I and antisocial personality disorder and learning disorder, by
8   history, under Axis II. [AR 556.] Dr. Colonna assessed that the
9   plaintiff was generally able to understand, remember and carry out
10  short and simple instructions without impairment.  He only showed mild
11  inability to understand, remember and carry out detailed instructions.
12  Although the plaintiff did not have a work history outside of prison,
13  "based on cognitive impression," the plaintiff was able to make simple
14  work-related decisions and sustain an ordinary routine without special
15  supervision.  Dr. Colonna assessed that the plaintiff had a mild
16  inability to get along with supervisors, coworkers, and peers. The
17  plaintiff had a moderate impairment in ability to respond
18  appropriately to work pressures and changes in a routine work-setting.
19  [AR 557, 558-59.]
20      In January, 2004, the plaintiff was psychiatrically evaluated by
21  Dr. John S. Woodard who assessed that the plaintiff had slight to
22  moderate impairment in interacting with the public, slight impairment
23  for interacting with supervisors and co-workers, slight impairment in
24  maintaining concentration and attention, slight impairment for
25  withstanding normal stressors and pressure in the work place, slight
26  impairment in performing detailed complex tasks, and no impairment in
27  performing simple repetitive tasks.  Similarly, the plaintiff had no
28  impairment in working on a continuous basis without special

- 13 -

1  supervision.  The plaintiff had a slight to moderate incapacity for

2  completing a normal work week without interruption.  Dr. Woodard

3  assessed intellectual functioning to be grossly intact. [AR 570, 573-

4  74.]

5      The plaintiff's treating psychiatrist, Dr. Meyong Choi, on the

6  other hand, completed a form in June, 2004, indicating essentially

7  that the plaintiff met Listings 12.03 and 12.04 [AR 625] and that the

8  plaintiff had, <u>inter</u> <u>alia</u>, marked difficulties in maintaining social

9  functioning and in maintaining concentration, persistence or pace [AR

10 635].  However, there is no issue concerning the propriety of the

11 ALJ's rejection of this opinion as well.

12     Dr. Griffin, while diagnosing borderline intellectual

13 functioning, also testified that the plaintiff was capable of

14 learning, remembering, and carrying out simple repetitive tasks and

15 even more. [AR 71-72.] Dr. Griffin further testified that the record

16 evidences difficulty interacting with others.  Although "[t]here is no

17 bonified [sic] mental disorder on which to attach this difficulty in

18 getting along with others, . . . it is nonetheless here." [AR 72.]

19     Thus, several consultative examiners and even Dr. Griffin, who

20 diagnosed borderline intellectual functioning, found that the

21 plaintiff was at the very least capable of simple, repetitive tasks

22 with minimal contact with supervisors, co-workers, and the general

23 public.  The ALJ's hypothetical to the vocational expert, therefore,

24 even absent specific reference to the words "possible borderline

25 functioning," sufficiently incorporated all of the plaintiff's

26 functional limitations in the hypothetical.  There was, therefore, no

27 error.

28 \\\

The plaintiff also asserts that the very fact that the ALJ did not inquire of the vocational expert whether there was a conflict requires remand, citing SSR 00-4p, which states, inter <u>alia</u>, that "the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT" and if a conflict is identified, that the ALJ explain in his decision how the conflict was resolved.  However, other than arguing that because he is in the bottom ten per cent of the population, there is a conflict between the DOT and the vocational expert's testimony, the plaintiff identifies no other conflicts which require explanation pursuant to SSR 00-4p.  The plaintiff's argument that the mere fact that the ALJ did not inquire whether there was any conflict when no conflicts were identified or were apparent "erroneously assumes that an ALJ must make a mechanical inquiry on this point any time a VE testifies." <u>Thompson v. Barnhart</u>, 281 F.Supp. 2d 770, 782 (E.D. Pa 2003); <u>see</u> <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446-47 (7th Cir. 2002).

**<u>The plaintiff's education</u>**

Whether the plaintiff is entitled to benefits or whether he is legitimately found "not disabled" can depend upon his educational classification.  Medical-Vocational Rule 203.10 provides that a person of advanced age with a limited education[4] or less with no work history is considered "disabled" even if capable of medium work.  On the other hand, a person with a high school education with a similar background would be found "not disabled" under Rule 203.14.

---

[4]A seventh through eleventh grade level of formal education is generally considered a limited education. 20 C.F.R. § 416.964(b)(3).

_____ The plaintiff contends that the ALJ erred by "slavishly citing to the numerical grade achieved" by the plaintiff.  Joint Stipulation at 20.  The plaintiff cites 20 C.F.R. § 416.964(b) which provides that "[f]ormal education that [the individual] completed many years before [the] impairment began . . . may no longer be useful or meaningful in terms of the [individual's] ability to work," and that the numerical grade completed in school may not accurately reflect actual educational abilities. [Joint Stipulation at 15.] The plaintiff contends that because he only achieved a fourth grade education in school, because the GED he obtained was in the remote past, and because he has spent the better part of his life in jail, the plaintiff, notwithstanding the GED, does not have a high school education.[5]

However, the Medical-Vocational Rules themselves fully interpret 20 C.F.R. § 416.964(b) and "reflect the analysis of the various vocational factors (i.e., age, education, and work experience) in combination with the individual's residual functional capacity . . . in evaluating the individual's ability to engage in substantial gainful activity in other than his or her vocationally relevant past

_____

[5]As support for his argument, the plaintiff cites <u>Dixon v. Heckler</u>, 811 F.2d 506, 509-10 (10th Cir. 1987).  However, the issue in <u>Dixon</u> was not whether she completed sixth or seventh grade but whether she was illiterate.  The court found that just because Dixon had six or seven years of formal schooling, this was not substantial evidence that the plaintiff was literate when there was essentially uncontroverted evidence that the plaintiff could not write.  <u>Dixon</u> does not stand for the proposition that an individual's stated level of education does not accurately reflect her educational capabilities because the education was obtained in the past. There is nothing in <u>Dixon</u> that suggests that she forgot how to write because of the remoteness of her education. Rather, Dixon provided evidence that her level of formal education did not accurately reflect her educational abilities.

- 16 -

1  work."  Section 200.00, Appendix 2, Subpart P, 20 C.F.R. Part 404.
2  The Rules specifically take into full consideration that the education
3  for people closely approaching advanced age and older was "ordinarily
4  completed in the remote past."  Section 201.00(g), 202.00(c).  For
5  example, the Rules recognize that an individual closely approaching
6  advanced age limited to sedentary work is so significantly limited
7  vocationally such that "even a high school education or more
8  (ordinarily completed in the remote past) would have little impact for
9  effecting a vocational adjustment unless relevant work experience
10  reflects use of such education."  Section 201.00(g).

11  In contrast, an individual capable of a medium work is generally
12  considered to have "such substantial work capability at even the
13  unskilled level that a finding of disabled is ordinarily not
14  warranted."  It is only when the individual is of advanced age with a
15  limited education and an "absence of any relevant work experience"
16  that the individual's vocational profile is considered sufficiently
17  adverse to warrant a finding of disabled.  Section 203.00(b) and (c).

18  Therefore, even in the absence of relevant past work, with a
19  functional capacity for a wide range of medium work, the fact that the
20  education was obtained in the remote past does not negate the fact
21  that the plaintiff has a high school education.  The Rules used by the
22  ALJ as a framework have already taken into consideration the
23  provisions of 20 C.F.R. § 416.964(b).

24  From a factual standpoint, the evidence also supports the ALJ's
25  finding that the plaintiff has a high school education, although, as
26  noted by the ALJ, the plaintiff's various statements in this regard
27  are inconsistent. [AR 16.] In his Disability Report, the plaintiff
28  indicated that he completed the fourth grade. [AR 156.] Consistent

with his Disability Report, the plaintiff told Dr. Vintas that he dropped out of school in the fifth grade. [AR 251.] However, he told Dr. General that he completed high school at age eighteen while in jail. [AR 518; see also AR 542, 568.] Elsewhere, the plaintiff indicated that he completed the 9th grade and obtained his GED while in prison.  [AR 554.]

The plaintiff's testimony concerning his education did nothing to clarify the inconsistency:

[ALJ]:     What education do you have?

A:         Limited.

Q.         Pardon me?

A.         Limited.

Q.         What does that mean?

A.         It's limited, it's very limited, very, very
           limited.

Q.         I see. . . . Tell me how many years you attended
           school and explain why there are discrepancies –

A.         Sir, I can't explain all that to you because I
           don't really know.  I forgets [sic] a lot of
           things.  My memory don't even work completely. . .
           . . .

Q.         What do you mean by a limited education?

A.         Well, I can't function that well academically.
[AR 59-60.]

Even so, and even assuming that the plaintiff's "reading and writing is very poor" [AR 159], the ALJ apparently considered that the plaintiff's writing was not so poor as to prevent him from possibly completing the third party questionnaire for his landlord to sign

"given than [sic] some answers begin with the pronoun 'I' rather than 'he.'" [AR 28; see AR 206.] While the plaintiff has presented testimonial evidence that his level of formal education may not accurately reflect his educational abilities, on the other hand, substantial evidence supports the ALJ's finding to the contrary.

The plaintiff next argues that the ALJ's finding that the plaintiff is limited to simple, unskilled repetitive tasks is inconsistent with his finding that the plaintiff has a high school education because "[t]he Commissioner by regulation states that an individual with high school educational abilities can do 'semi-skilled through skilled work' while a marginal education provides a claimant with the educational ability to perform 'simple, unskilled types of jobs,'" quoting 20 C.F.R. § 416.964(2) and (4).  However, contrary to what the plaintiff implies, 20 C.F.R. § 416.964(4) draws no such fixed definitions but rather states that someone with a high school education is "generally" considered to be capable of semi-skilled or skilled work.  More significantly, the plaintiff asserts that he has a mental impairment.  It is this mental impairment which limits the plaintiff to simple, repetitive unskilled tasks, not his level of education.  The plaintiff's claimed mental impairment, furthermore, is not limited to his alleged borderline intellectual functioning.  The plaintiff also claimed that he heard voices and that he had memory loss, and the ALJ and several examiners found that the plaintiff suffered from mood disorder or dysthymia which was also taken into consideration in the assessment of the residual functional capacity. [See AR 570.] Accordingly, the fact that the plaintiff is limited to simple unskilled work does not lead to a conclusion that the plaintiff does not have a high school education.

**CONCLUSION**

After careful consideration of the complaint, joint stipulation of the parties, the transcript of the record, and in accordance with the foregoing discussion, the magistrate judge finds that the decision of the Commissioner is supported by substantial evidence and that the Commissioner applied the proper legal standards.

**ORDER**

IT IS ORDERED that judgment be entered in favor of the Commissioner and against the plaintiff.


Dated: January 26, 2006


                                        _____/s/_____
                                        JAMES W. McMAHON
                                        United States Magistrate Judge